Saul S. Stkeit, J.
The Waterfront Commission of New York Harbor brings this complaint against the International Longshoremen’s Association, Michael Baiola, individually and as its president, Mario Cinisomo, individually and as its secretary-treasurer, Anthony Anastasio, individually, and Universal Terminal and Stevedoring Corporation. The commission has consented to dismissal of the complaint against Michael Baiola and Mario Cinisomo.
In its complaint the commission alleges that the union and the individual defendants, not being persons licensed by the Waterfront Commission to select longshoremen for employment, participated in the hiring of longshoremen by demanding of Universal Terminal that six certain casual longshoremen be placed on a roster of regular longshoremen to share equally in the earnings with the said regular longshoremen and to rotate employment equally with the regular longshoremen; that the defendant Universal aided and abetted said participation in the hiring by its acquiescence and compliance with said demands of the defendants; that such conduct violated article V of the Waterfront Compact, requiring that those who hire longshoremen be licensed; article XII, which requires that the hiring take place at plaintiff’s information centers; and section 7.13 of plaintiff’s regulations, prohibiting any person from participating in the selection or designation of a person for employment except a licensed agent.
The plaintiff then asks for a judgment of $500 against the defendants for each of the longshoremen hired and for every day’s continuance of such violation, as well as an injunction restraining the defendants from participating in the selection of longshoremen.
All of the defendants deny that they participated in the hiring of these six longshoremen.
In addition, the defendant Universal contends that section 7.13 of the Waterfront Commission Begulations is invalid because it is vague and indefinite.
Before discussing the facts, I desire to point out that I am familiar with the Crime Commission’s and the Legislature’s findings which led to the enactment of the Waterfront Commission Act and the Federal approval of the Compact (L. 1953, *408 chs. 882, 883; L. 1957, ch. 188; N. J. S. A., § 32:23-1 et seg.; 67 U. S. Stat. 541). I am also aware of some of the evils sought to be eliminated by the Act, such as the shape-up, union control of hiring, and the control of hiring by unscrupulous hiring foremen who are merely nominees of the union forced upon the employers. I am also cognizant of the findings and declarations in article I of the Compact relating to corrupt hiring practices of hiring agents who are neither responsible to the employers nor the uncoerced will of the majority of the members of the labor organizations. It is in these findings and in these declarations that we find the intent of the Legislature when it enacted the following sections and definitions which, in part, read:
‘1 A license to act as a * * * hiring agent shall be issued only upon the written application # * . * of the person proposing to employ [him] ”. (Art. V, § 2.)
“No person shall, directly or indirectly, hire any person for work as a longshoreman * * * except through * * * employment * * * centers [established and maintained] by the commission. ” (Art. XII, § 2.)
A hiring agent means any person who on behalf of a stevedore shall select any longshoreman for employment, and the term “ select ” includes the selection of a person for the commencement or continuation of employment as a longshoreman, or the denial or termination of employment as a longshoreman. (L. 1957, ch. 188.)
The Compact also provides that it shall be liberally construed to eliminate the evils described.
It also authorizes the commission to make rules and regulations to effectuate the purposes of the act.
Presumably, therefore, under the authority of section 2 of article V, which treats of the licensing of hiring agents, and section 2 of article XII, which prohibits the hiring, directly or indirectly, of any longshoreman except through established employment centers, and as the commission points out in its (brief, “ to make crystal clear the requirements of the Compact,” it promulgated regulation 7.13, which provides, ‘ ‘ No person shall participate or attempt to participate in any way directly or indirectly in the identification, selection or designation of a person for employment as a longshoreman * * * except a licens'ed hiring agent or his superior.” (N. Y. Off. Comp, of Codes, Rules & Regulations, 11th Off. Supp., p. 643.)
It is this regulation which the defendants are charged with violating and it is this regulation which the defendant Universal says is too vague and invalid.
*409 I hold that the Compact most liberally construed prohibits the selection or hiring of any longshoreman except through a licensed hiring agent, licensed by the commission.
If that is what the commission intended by using the word ‘ ‘ participation ’ ’ in regulation 7.13, it would be a valid exercise of its powers. If the commission rule intended otherwise, or attempted to extend the statute, it would be ineffective. It cannot possess or have any greater application and force than the law itself and must be read in connection with it, since the purpose and object of the rule must be to carry out the intent of the statute and conform thereto.
To participate, -says the Webster dictionary, means to have a share in common with others; to partake; to partake of; to share in. It does not mean to recommend. It does not mean to suggest. I will say that it would include domination, dictation, or control.
With that interpretation of the regulation in mind, let us now turn to the evidence in this case.
The undisputed facts are that the defendant Universal Terminal and Stevedoring Corporation was a stevedore licensed by the Waterfront Commission and operated its stevedoring equipment and trucks at various piers in Brooklyn, and more particularly at Piers 17 and 18. The employer had a contract with the Meyer Line-, whose shipping formed the bulk of the employer’s work at these piers. Universal employed 40 drivers, all members of Local 1814,1. L. A., one of the defendants in this case, whose duty it was to operate the employer’s equipment at these piers.
These drivers were hired by the employer in accordance with the approved practices provided by articlesV and XII of the Compact and the regulations promulgated by the commission. The commission makes no complaint with respect to the hiring practices of these 40 men while all were employed at Piers 17 and 18, and the other piers used and operated by the defendant Universal.
Of these 40 men, 27 were known as regular drivers and 13 as extras. It is here that a dispute arises as to the exact status of these 13 extras. The commission contends that this group of approximately 40 drivers was divided into three categories. Twenty-seven were classified as steady drivers, who had first preference for employment. These 27 shared the work on an equal basis. Then, when there was not enough work for all of these 27 on a particular day, the ones who were left out that day would be the first to obtain employment on the following *410 day. Six drivers were classified, according to the commission, as steady extra drivers, who were employed when all of the 27 steady drivers were already employed or unavailable. Finally, six drivers were classified as extra extra drivers, who received employment only after the 27 steady and the 6 steady extra drivers had been employed.
The employer, that is, the Universal, and the union classify these 40 as 27 regulars and 13 extras. They do not recognize the term extra extras.
In July, 1958 it became known that the Meyer Line was moving from Piers 17 and 18 to a new pier known as Pier 2. As a consequence of such removal, the employer’s work would be considerably decreased and the need for 40 men would no long-er be present. Aware of this situation, a meeting was called by the defendant Anastasio, the business manager of the union, in the latter part of July, at the union offices. Present at this meeting were 39 or 40 drivers and several union officials.
At this meeting it was suggested by Anastasio that in view of the Meyer Line’s pending removal this work force of 40 be divided into 20 each, one group of 20 remaining at Piers 17 and 18, and the other 20 going to Pier 2. Volunteers were asked for and this division was accomplished. Of the 20 remaining at Piers 17 and 18, which piers are involved in the legal controversy here, 9 were known as regulars or steady drivers, and 11 were extras. The commission claims that of these 11, 5 were steady extra drivers and 6 were extra extra drivers. The employer and the union claim that there was n'o distinction between the 11 extras.
At this point the facts as to what took place at the meeting with respect to the sharing of tire work by the 20 men who volunteered for Piers 17 and 18 comes into dispute. The 9 regulars and 2 of the steady extras contend that at no time did the regular drivers, that is, the steady and steady extra drivers, as they call them, of Piers 17 'and 18 agree to share the work with the extra extras, nor did they even discuss that possibility. The union, on the other hand, and Universal contend that there was such a discussion at the meeting with respect to sharing of the Avork and that a large majority of the men agreed that there ought to be rigid rotation for all of the men.
On September 12 the Meyer Line left Piers 17 and 18, and on September 15 Ortenzi, the employer’s hiring agent, was asked by a union representative to hire the 20 men on a rigid rotation basis. Ortenzi was agreeable to a rotation hiring of the 9 steady drivers with the 5 steady extra drivers, but not *411 agreeable to include the so-called 6 extra extra drivers in this rotation system.
On September 16, after a meeting of the men at the garage, where there were present one Neary, general superintendent of the employer, two union officials, and a Mr. Mossman, of the ■shipping association, a discussion took place, following which they were referred back to the union. The union delegates returned and told Mr. Ortenzi that the men had agreed at the union meeting in July that all 20 men rotate.
Mr. La Gatta and Mr. Rey testified on behalf of the plaintiff that there was no such agreement at the union meeting, although Mr. La Gatta did testify that Mr. Anastasio did mention something about equalization for the men beyond three years, 'and that he returned later to challenge the six casuals (the six so-called extra extras).
The defendant Anastasio said that the men agreed to distribute the work on an “ equalization ” basis, as he termed it.
The witness Oartelli, an assistant hiring agent employed by the defendant Universal, testified that the men discussed rotation and agreed to it at the July meeting.
As a consequence of this meeting of September 16, and after the return of the union delegates, Mr. Neary, the general ■superintendent for the employer, instructed Ortenzi to hire the 20 men on a rotation basis. From that day to this the work at Piers 17 and 18 has been on a rotation basis for all 20 men, including the six so-called casuals or extra extras.
Thereafter there was a work stoppage. A complaint was made by several of the regular men to the Joint Labor Relations Committee, pursuant to the grievance machinery set up in the collective bargaining agreement between the shipping association and the union, that their seniority rights were being infringed.
It is not disputed that the 20 men now at Pier 2 voted to rotate on the night of the meeting in July. It is admitted that at the July meeting Mr. Anastasio did mention the fact that all those longshoremen with three years of service should have equal rights with the others. It is a fact that the 9 regulars agreed with the 5 extras to rotate at Piers 17 and 18 before the meeting in July took place.
The Cargo Agreement between the shipping association and the union at page 27 defines regular men as those employed at a specific pier or terminal, and extra men as those who have the status of extra men.
*412 The commission regulation 7.6 (c) defines regular men as those employed 12 days during the preceding month.
The machinery for determining seniority is provided for in Parts 7 and 12 of the Cargo Agreement, but up to this point has not been effectuated.
Nowhere in the regulations or the statute or in the Cargo Agreement is there any provision for determining when an extra or a so-called extra extra becomes a regular.
John Bey, testifying for the plaintiff, said that he was an extra for only two years when the regulars voted him in. Yet he complained when the extras who had three years of experience were designated as regulars.
The commission makes no complaint about the order or agreement to transfer and rotate the 20 men at Pier 2, and acquiesced in by Ortenzi. It makes no complaint about the agreement between the 9 regulars and the 5 extras to rotate at Piers 17 and 18, and acquiesced in by Ortenzi.
The only disputed fact before me is whether the 40 men, or even the 20 men who were assigned to Piers 17 and 18 agreed at the July meeting to rotate. Twenty-five of those 40 contend that there was such a discussion and that there was an agreement for both those assigned to Pier 2, and those assigned to Piers 17 and 18 to rotate. Eleven, consisting of the 9 regulars and 2 extras, contend that they heard no discussion concerning rotation or split employment, but that there may have been a discussion after they left.
On the basis of this testimony the commission now asks me to conclude that there was no discussion concerning rotation of the men at Piers 17 and 18 at the July meeting and that there was no agreement among the men assigned to Piers 17 and 18 and hence, there being no agreement, the request of the union delegate on September 17 to rotate the 20 men and a compliance by Universal consisted of a participation in the hi ring; of longshoremen contrary to regulation 7.13, that is, the request was tantamount to a dictation, a coercion, or control as I have construed this regulation.
This I am unable to do. I find that the plaintiff has failed to establish by a fair preponderance of the evidence either that there was a failure to agree to rotate or that the defendants in any way participated in the selection or designation of any of the longshoremen within the meaning of the section as I . have defined it.
This is not a case involving an unscrupulous or corrupt • hiring foreman, or of corrupt hiring practices, or coercion. *413 Bather, it appears from the testimony of the regulars (who were willing to share the work with 5 extras, but not with the extra extras), that this is an internal dispute concerning seniority rights covered by section 2 of article XV of the Compact, with which neither the commission nor this court is concerned.
The complaint is dismissed. Settle decree.